9



FILED

MAR – 2 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF CALIFORNIA
#### FRESNO DIVISION

|  |  |
|---|---|
| In re ) | Case No. 10-13736-B-13 |
| ) | |
| Gary Vincent Lopez and ) | DC No. BAR-2 |
| Glennda Rae Berry Lopez, ) | |
| ) | |
| Debtors. ) | |

---

## MEMORANDUM DECISION REGARDING
## MOTION TO VALUE COLLATERAL

This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9ᵗʰ Cir. BAP Rule 8013-1.

Ben A. Roberts, Esq., appeared on behalf of the debtors, Gary and Glennda Lopez. Beth Stratton, Esq., appeared on behalf of Ford Motor Credit Company.

In this contested matter, Gary and Glennda Lopez (the "Debtors") seek to value the collateral of Ford Motor Credit Company ("Ford"), a 2006 F-150 pickup (the "Pickup"). The Debtors need to fix the amount of Ford's secured claim in conjunction with confirmation of their chapter 13 plan (the "Plan"). Ford offered evidence of the Pickup's value based on adjustments to the retail value published by Kelley Blue Book ("Kelley"). The Debtors countered with a method of valuation based on evidence of the Pickup's wholesale value adjusted upward to include the average dealer markup (the "Wholesale-plus" formula). For the reasons set forth

below, the court concludes that Ford's method of valuation for an automobile is more consistent with the Bankruptcy Code and applicable case law. Based thereon, the value of the Pickup, for the purposes of confirming the Plan and fixing Ford's secured claim, is $12,000.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052. The court has jurisdiction over this matter under 28 U.S.C. § 1334, 11 U.S.C. §§ 506 and 1325[1] and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A) & (L).

**Background and Findings of Fact.**

The Debtors' petition was filed on April 8, 2010. With the petition, they filed their Plan together with all required schedules which list both the Pickup and Ford's secured claim.[2] Ford filed a proof of claim in the amount of $18,834.15, but the proof of claim fails to state a value for the Pick-up or any amount of unsecured deficiency. By inference, Ford contended initially that the claim is fully secured.

---

[1] Unless otherwise indicated, all bankruptcy, chapter, code section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated after October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23 ("BAPCPA").

[2] The Pickup is listed on schedule B with a value of $12,830. In their chapter 13 plan, and the attached motion to value collateral, the Debtors gave an opinion under penalty of perjury that the "replacement value" of the Pickup was $12,830. When the Debtors first filed and served this motion, they filed a declaration, again under penalty of perjury, stating that the Pickup was only worth $7,800. At the conclusion of the trial in this contested matter, Debtors' counsel urged the court to find that the value of the Pickup does not exceed $9,000. The Debtors do not explain the discrepancy between their schedules, the original motion and declaration attached to their Plan, and the prayer in this motion. However, the schedules may be amended as a matter of course at any time before the case is closed. F.R.B.P. 1009(a). The court deems this motion to constitute an amendment of the schedules and gives no weight to the Debtors' personal opinions regarding the value of the Pickup.

2

The Debtors do not contest the amount of Ford's claim, only the value of its collateral, and there is no dispute that Ford has a valid lien against the Pickup.

The Pickup is a 2006 F-150 Crew-Cab XLT. At the commencement of the case, it had about 142,000 miles. At the evidentiary hearing, both parties presented the testimony of expert witnesses who appeared to be qualified in their respective fields. Neither of the expert witnesses was a certified appraiser, however, both had many years experience in the wholesale and retail automobile business. Both expert witnesses had driven and made a complete visual inspection of the Pickup. Neither witness had performed any mechanical diagnostics on the Pickup and there was no evidence of unusual problems with the vehicle. Both witnesses agreed that the Pickup is in very good condition with no significant body damage. It runs well and drives well, but does need a new windshield, new tires, and would have to be detailed before it could be sold. Both expert witnesses estimated the "reconditioning" costs to be about $800 - $1,000. Both witnesses gave opinions based on different starting values, wholesale and retail, as published by Kelley. However, from there, the witnesses used two different methods to arrive at the Pickup's "replacement" value which is required by the Bankruptcy Code.

Using the "Wholesale-plus" pricing method, the Debtors' expert, Keith Cunha, testified that the Pickup had a Kelley published wholesale value somewhere between $7,000 and $7,400. According to Mr. Cunha, this is the price which a retailer could expect to pay to acquire a used vehicle, like the Pickup, on the wholesale market. Mr. Cunha then estimated that the retailer's average "markup" for the Pickup would be approximately $1,500 to $2,000. This resulted in a suggested "selling" price somewhere between $8,500 and $9,400. In theory, this represents the Pickup's "replacement" price; the price that the Debtors would have to pay to purchase a similar vehicle from the retailer.

Mr. Cunha testified that vehicles like the Pickup are not warrantable and very difficult to finance, primarily because of its age and mileage. Both of these factors

3

would, in Mr. Cunha's opinion, tend to depress the selling price which a dealer could charge for a similar vehicle. Mr. Cunha did not have any experience actually selling a vehicle like the Pickup, but he did acknowledge that a similar vehicle, a 2005 F-150 pickup with 95,000 miles had recently sold, in March 2010, in the Debtors' geographic location for $12,900. That vehicle had substantially fewer miles than the Pickup, but was also one year older. In closing argument, the Debtors' counsel asked the court to fix the value of the Pickup at not more than $9,000.

In response, Ford's expert, Jerry Dansby testified that the Pickup had a Kelley "retail" price of approximately $20,100. He then deducted approximately $6,300 for the mileage and $1,800 for reconditioning costs to arrive at a suggested "selling" or "replacement" price of $12,000. Mr. Dansby's testimony was consistent with Debtors' original statements regarding the Pickup's value. *See* footnote 2, *supra*. His testimony is also consistent with Mr. Cunha's testimony above relating to the recent sale of a similar 2005 model vehicle.

**Issues Presented.**

There is no dispute that the value of the Pickup, for purposes of plan confirmation, is determined by its "replacement" value as defined in § 506(a). The sole issue presented to the court is one of mixed law and fact and may be stated simply as, which of the two pricing methods described above should be used to determine that "replacement" value. In relative terms, the parties are substantially far apart in their respective "values." The court must choose, based on the evidence presented, between one of the suggested results. There is no evidence or "sliding scale" formula upon which the court can arrive at a "middle ground" value.

**Burden of Proof.**

Generally, a secured creditor's proof of claim constitutes prima facie evidence of the validity and amount of its claim. *Brown v. IRS (In re Brown)*, 82 F.3d 801, 805 (8th Cir. 1996); Fed.R.Bankr.P. 3001(f). This presumption places the

4

1    burden of producing evidence to rebut the presumption on the debtor. *Id.* Indeed,

2    absent a timely motion by the debtor to value the creditor's collateral, the chapter 13

3    trustee generally accepts the amount stated as "secured" in the proof of claim for

4    purposes of paying the claim in a plan. Once a motion to value is filed by the

5    debtor, the creditor has the ultimate burden of persuasion to prove by a

6    preponderance of the evidence the value of the collateral which secures its claim.

7    *Id.* Here, any presumptive weight which may flow from Ford's proof of claim is

8    extinguished by the proof of claim itself, which does not declare a value for the

9    Pickup. Ford's own evidence offered in this contested matter establishes that the

10   value of the Pickup is substantially less than the amount of its claim.

11   **Analysis and Conclusions of Law.**

12           **Valuation Under 11 U.S.C. § 506(a).** Pursuant to § 1325(a)(5)(B)(ii), a

13   debtor cannot confirm a chapter 13 plan which provides for the payment of a

14   secured claim unless, *inter alia*, (1) the holder of the secured claim accepts the plan,

15   or (2) the plan provides for payments, as of the effective date of the plan, that are

16   not less than the allowed amount of the secured claim. Section 506(a)(1) of the

17   Bankruptcy Code gives the court authority to determine the value of a secured

18   creditor's collateral, and fix the amount of its secured claim, for purposes of plan

19   confirmation.

20           An allowed claim of a creditor secured by a lien on property in which
         the estate has an interest . . . *is a secured claim to the extent of the*
21       *value of such creditor's interest in the estate's interest in such*
         *property,* . . . and is an unsecured claim to the extent that the value of
22       such creditor's interest . . . is less than the amount of such allowed
         claim. Such value shall be determined in light of the purpose of the
23       valuation and of the proposed disposition or use of such property
         . . . . (Emphasis added.)

24

25   11 U.S.C. § 506(a)(1).

26           Prior to the enactment of BAPCPA, the prevailing method for determining

27   the value of an automobile was based on its replacement value. *In re Scott,*

28

                                    5

437 B.R. 168, 172-73 (Bankr. D.N.J.,2010). The Supreme Court in *Associates Commercial Corp. v. Rash (In re Rash)*, 520 U.S. 953, 959, n.2 (1997), defined replacement value as "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition." However, *Rash* left to the bankruptcy courts the discretion to determine the proper method for fixing that "replacement" value. *Id.*

BAPCPA substantially amended § 506 with the addition of subsection 506(a)(2), which provides:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the *replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing.* With respect to property acquired for personal, family, or household purposes, *replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.* (Emphasis added.)

Most courts have interpreted the first sentence of subsection 506(a)(2) as codifying the Supreme Court's decision in *Rash*. The value of an automobile under 506 is generally determined on a "case-by-case basis." *In Re Morales*, 387 B.R. 36, 41 (Bankr. C.D.Ca. 2008). The value of an automobile acquired for personal, family and household purposes is also determined as of the petition date, not the hearing date. *Id.* at 45.

The bankruptcy courts have universally accepted the Kelley Blue Book and the N.A.D.A. Guide as reliable sources for determining a vehicle's value. At the same time, the courts have recognized that the Kelley published "retail" price is just a starting point for the inquiry. In the case, *In re De Anda- Ramirez*, 359 B.R. 794, 797 (BAP 10th Cir. 2007), the court observed that Kelly's published "retail" value is inherently unreliable because it assumes that the subject vehicle is in excellent

6

condition and only applies to about 5% of the vehicles in the market.[3]  The accepted method for determining the value of an automobile, as applied by virtually all of the courts with published decisions on the topic, was recently summarized in *In re Morales*:

> After reviewing the statute, the available caselaw, and the arguments of the parties, this Court concludes that the correct method for calculating the retail value of a vehicle under § 506(a)(2) ultimately depends on the facts presented in each case. *Cf. Taffi v. United States (In re Taffi)*, 96 F.3d 1190, 1193 (9th Cir. 1996), *cert. denied*, 521 U.S. 1103, 117 S. Ct. 2478, 138 L. Ed. 2d 987 (1997).  As a general principle, however, this Court further concludes that, absent unusual circumstances, the retail value should be calculated by adjusting the Kelley Blue Book or N.A.D.A. Guide retail value for a like vehicle by a reasonable amount in light of any additional evidence presented regarding the condition of the vehicle and any other relevant factors. *See In re Coleman*, 373 B.R. 907, 912-13 (Bankr. W.D. Mo. 2007); *In re Carlson*, No. 06-40402, 2006 WL 4811331, at *2 (Bankr. W.D. Wash. Dec. 8, 2006); *In re Eddins*, 355 B.R. 849, 852 (Bankr. W.D. Okla. 2006).  Value should be calculated as of the petition date, not the valuation hearing. The burden in proving the reasonableness of any deviation from the guide retail value rests with the debtor because the debtor has the best access to information about the condition of the vehicle. *See In re Coleman*, 373 B.R. at 913; *In re Eddins*, 355 B.R. at

---

[3]Based on the evidence presented, the court in *In re De Anda-Ramirez* accepted Kelly's "private party" value as the appropriate value for the subject automobile.  Here, neither party raised that issue or offered evidence of the "private party" value.  Kelley defines its retail value as follows:

This value assumes the vehicle has received the cosmetic and/or mechanical reconditioning needed to qualify it as "Excellent."  This is not a transaction value; it is representative of a dealer's asking price and the starting point for negotiation. Kelley Blue Book (2007), http://www. kbb. com. "Excellent," as defined by KBB, means:

that the vehicle looks new, is in excellent mechanical condition and needs no reconditioning. This vehicle has never had any paint or body work and is free of rust. The vehicle has a clean title history and will pass a smog and safety inspection. The engine compartment is clean, with no fluid leaks and is free of any wear or visible defects. The vehicle also has complete and verifiable service records. Less than 5% of all used vehicles fall into this category.

*In re De Anda-Ramirez*, 359 B.R. 794 at 797, citing Kelley Blue Book (2007), http://www.kbb.com.

7

852. This general approach offers the benefits of standardization and predictability to parties without automatically conflating the artificial guide retail value with the actual retail value of the vehicle.

The Court's decision brings it into line with the general approach of most bankruptcy courts interpreting § 506(a)(2) and with the bankruptcy courts of the Ninth Circuit, as well as the traditional case-by-case approach to valuation established by the Ninth Circuit in *In re Taffi*.

*In re Morales*, 387 B.R. at 45 (footnote omitted).

**Application to This Case.** Turning now to the evidence presented in this case, it appears that Ford's testimony and method for valuing the Pickup is more consistent with the method applied by virtually all of the other courts that have wrestled with the "vehicle valuation" issue since the enactment of BAPCPA. Ford's expert witness began with the Kelley published "retail" value and adjusted that number downward to arrive at a "replacement" value which takes into account the age, mileage and condition of the vehicle. Ford does not contend that the Pickup was in excellent condition and did not rest on the Kelley retail value alone. Ford's contention regarding the "replacement" value of the Pickup ($12,000), being the "price a willing buyer in the debtors' situation would pay a willing seller to obtain property of like age and condition," is corroborated by the fact that a similar pickup did sell, in the Debtor's geographic location, at about the time of the petition, for $12,900.

**The Debtors' Wholesale-plus Formula.** The "Wholesale-plus" pricing method offered by the Debtors may be an acceptable method for valuing collateral in the absence of any competing evidence; however, it is not one which appears to have been used or accepted by any court in the context of a contested matter. The Debtors' method, based upon such variables as the wholesale market and the average dealer's markup, is entirely subjective and would introduce a great deal of uncertainty into the valuation process. Every used car dealer has various sources for obtaining its inventory and various costs and overhead factors which must be

8

covered by its "markup." Subsection 506(a)(2) specifically prohibits the court from considering "costs of sale and marketing" which makes the "markup" approach difficult to apply.

The biggest difference between Ford's pricing method and the Debtors' Wholesale-plus method lies in their starting points. While both methods, in theory, should arrive at the same point, it's clear to the court, as here, that they don't. The choice then must be driven with reference to the governing statute, subsection 506(a)(2), and the cases that have interpreted it. First, subsection 506(a)(2) itself makes reference to "the price a retail merchant would charge." This would suggest that a recognized "retail" price, as opposed to the "wholesale" price is the appropriate place to begin the analysis. Second, in reviewing the various cases that have applied subsection 506(a)(2), the court has not found any examples where the "replacement" value of a vehicle was calculated from the "wholesale" value. As stated in *Morales*, the pricing method used by Ford better offers "the benefits of standardization and predictability to parties" and brings this court's decision "into line with the general approach of most bankruptcy courts interpreting § 502(a)(2)." *Morales*, 387 B.R. at 45.

**Conclusion.**

Based on the foregoing the court is persuaded that Ford's method for valuing the Pickup based on downward adjustments to the Kelley Blue Book retail value, is more consistent with the governing statute and applicable case law. The value of the Pickup, and the amount of Ford's secured claim will be fixed at $12,000.

Dated: March _____2_____, 2011

W. Richard Lee
United States Bankruptcy Judge

9